**[Cite as *State v. Russell*, 2012-Ohio-6050.]**

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                       :            C.A. CASE NO.    25055

v.                                               :            T.C. NO.    11CR4109

DUSTIN E. RUSSELL                                :            (Criminal appeal from
                                                              Common Pleas Court)

    Defendant-Appellant                      :

                                                 :

. . . . . . . . . .

## O P I N I O N

Rendered on the ___21st___ day of ___December___, 2012.

. . . . . . . . . .

CARLEY J. INGRAM, Atty. Reg. No. 0020084, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

ANTONY A. ABBOUD, Atty. Reg. No. 0078151, 130 W. Second Street, Suite 1818, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}**    This matter is before the Court on the Notice of Appeal of Dustin Russell,

filed February 27, 2012. Russell appeals from the February 22, 2012 judgment entry of conviction, following a no contest plea, to one count of possession of cocaine (20 grams but less than 27 grams), in violation of R.C. 2925.11(A), a felony of the second degree. Russell was sentenced to a three year prison term. We hereby affirm the judgment of the trial court.

{¶ 2} The record reflects that Russell, after initially pleading not guilty, filed a motion to suppress, which the court overruled after a hearing. At the hearing, the court heard the testimony of Detective Brian Dedrick of the Dayton Police Department. Dedrick testified that he has been employed with the Dayton Police Department since 2002, and that in August, 2010, he was assigned to the Narcotics Bureau. According to Dedrick, he initiated an investigation on November 7, 2011, after receiving information from a confidential informant that crack cocaine was being sold at a residence at 1205 Windsor Avenue, Dayton, Ohio. Dedrick stated that he obtained a search warrant for the residence on December 1, 2011. Russell was listed as a suspect in the warrant.

{¶ 3} Dedrick identified a copy of the warrant and testified that it was served at the residence on December 5, 2011. Dedrick stated that he responded to the address after the warrant had been served, at which time both the residence and Russell were secured. Dedrick stated that his "role was to conduct interviews and complete the investigation." Dedrick testified that he escorted Russell, who was in handcuffs in a chair in the living room, to an enclosed front porch. According to Dedrick, he introduced himself to Russell, advised him that he was identified as a suspect in the search warrant, and read him his *Miranda* rights "verbatim" from a "rights card." Dedrick stated that Russell indicated his understanding of each individual right as Dedrick read them to him. Dedrick stated that Russell agreed to speak to him without an attorney.

**{¶ 4}** According to Dedrick's testimony, Russell did not have trouble standing or walking and was not slurring his words. Dedrick stated that Russell "appeared normal" and did not appear to be under the influence of alcohol or drugs. Dedrick testified that Russell did not appear to suffer from any sort of mental disorder, that he did not indicate that he did not understand what was going on, and that he did not indicate to Dedrick that he did not want to talk to him.

**{¶ 5}** Dedrick further testified that there was a break in the conversation, during which time Dedrick brought Russell back inside the residence. After Russell was seated in the living room, Dedrick stated that Russell indicated that he no longer wanted to speak to him without an attorney. From that point in time, Dedrick testified that he did not ask Russell any further questions. Dedrick stated that he did not make any threats or promises to Russell.

**{¶ 6}** On cross-examination, Dedrick stated that there was an intervening weekend between the issuance of the warrant and its execution. Dedrick stated that the warrant was executed by a "seven-person entry team," and that four additional officers were stationed on the perimeter of the residence. Dedrick stated that he did not request that one of the other officers witness his interview of Russell or record their conversation. Dedrick stated that he did not complete a pre-interview form but read from his "rights card," and that he has "never gone through a form like that during a search warrant investigation. I just go over their rights with the card that I keep with me."

**{¶ 7}** Russell testified that on December 5, 2011, he was watching Monday Night Football at 1205 Windsor Avenue when Dayton Police Officers "kicked the door in."

Russell stated that he went to the floor, and "when they came in they stepped on my shoulder and twinked (sic) my arms behind my back." Russell stated that he was placed in handcuffs in a chair, where he remained for 20-25 minutes. Russell stated that Dedrick "lift me up by the chair and - - and we got to walkin' towards the porch." According to Russell, he has "been arrested plenty of times." Russell stated that Dedrick did not advise him of his rights. Specifically, Russell stated that Dedrick did not mention he had a right to an attorney.

{¶ 8} On cross-examination, Russell stated that he has "three or four" felony convictions, and that as a result thereof, he is aware that he has certain constitutional rights. When asked why he spoke to Dedrick, if Dedrick failed to advise him of his *Miranda* rights, Russell responded, "he just asked me like as far as what they say what they found in the house (sic). And I asked him like, 'What dope?'" Russell testified that he did not know why the officers were there, and that he asked Dedrick, "'[W]hy my man want a search warrant?'" Russell stated that Dedrick never threatened him, or promised him "a deal" in exchange for his cooperation. When asked if Dedrick grabbed him to lead him to the porch, Russell stated that Dedrick helped him "up out of the chair to go to the porch," and that Russell "didn't think I was forced, but I mean, I don't think I had a choice really." Russell stated that Dedrick did not intimidate him.

{¶ 9} In overruling Russell's motion to suppress from the bench, the trial court indicated that it found Dedrick's testimony to be credible, and it incorporated that testimony into the decision as the court's factual findings relating to Russell's statements. The court further determined that Russell's testimony lacked credibility.

{¶ 10} Regarding the search warrant, the court determined, "upon review of

Detective Dedrick's affidavit as a whole that the search warrant for 1205 Windsor Avenue was issued based upon probable cause that crack cocaine and items associated with the sale of crack cocaine would in probability be found within 1205 Windsor Avenue." The court acknowledged that "there is some ambiguity created by the affidavit stating that before the confidential informant went into 1205 Windsor Avenue to make a controlled purchase, he was checked for drugs and money with none being found. And that after the [confidential informant] had completed the controlled buy, [he] was again searched for drugs and money," with neither being found. The court determined, however, that when the affidavit is read in its entirety, it is clear that "before each controlled buy the CI was searched to ensure he had no drugs on him and no money other than the money provided to him to perform the controlled buy. And that after each controlled buy, the CI was once again searched to ensure he had no money or any drugs other than that which he purchased from 1205 Windsor Avenue." The court noted that the affidavit further provides that the C.I. identified a photograph of Russell.

{¶ 11} Regarding Dedrick's statements, the court concluded that Dedrick advised Russell of his rights and that Russell waived those rights prior to any interrogation. Further, the court noted, "there is nothing in the record to suggest that Mr. Russell, by virtue of a mental disease, intoxication, or otherwise, was not able to make a knowing waiver of his [*Miranda*] rights." The court concluded that Russell's waiver was voluntary, "because there is no evidence that Mr. Russell's waiver was the product of any force, threat of force, false promises, or anything else that acted to overcome Mr. Russell's will."

{¶ 12} Russell asserts two assignments of error herein. His first assignment of

error is as follows:

"THE TRIAL COURT ERRED BY DENYING MR. RUSSELL'S MOTION TO SUPPRESS AND MAKING A FINDING THAT THE SEARCH WARRANT WAS BASED ON PROBABLE CAUSE."

{¶ 13}  According to Russell, the "affidavit as presented to the magistrate reflects that the control[led] buy[s] did not yield any drugs.  The trial court cannot go outside the four corners of the search warrant and correct the alleged 'grammatical and sentence structure' errors of the affidavit."

{¶ 14}  Regarding the sufficiency of probable cause, this Court has previously determined as follows:

In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  (*Illinois v. Gates* [1983], 462 U.S. 213, 238-239, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 followed.)  *State v. Lane*, 2d Dist. Greene No. 07CA0014, 2008-Ohio-1605, ¶ 4.

{¶ 15}  This Court has further noted, "'[I]t is clear that "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'" * * * 'To establish probable cause to search a home, the facts must be sufficient to justify a conclusion

that the property that is the subject of the search is probably on the premises to search.'" *State v. Mays*, 2d Dist. Montgomery No. 23986, 2011-Ohio-2684, ¶ 14. Also, the "'nexus between the items sought and the place to be searched depends upon all of the circumstances of each individual case, including the type of crime and the nature of the evidence.' * * *." *Id.*

{¶ 16} As this Court further noted in *Mays*:

"An affidavit in support of a search warrant must present timely information and include facts so closely related to the time of issuing the warrant as to justify a finding of probable cause at that time. * * * No arbitrary time limit dictates when information becomes 'stale.' * * * The test is whether the alleged facts justify the conclusion that certain contraband remains on the premises to be searched. * * *." *Id.*, ¶ 21.

{¶ 17} As this Court additionally noted in *Lane:*

"In reviewing the sufficiency of probable cause in an affidavit submitted in support of a search warrant issued by a magistrate, neither a trial court nor an appellate court should substitute its judgment for that of the magistrate by conducting a *de novo* determination as to whether the affidavit contains sufficient probable cause upon which that court would issue the search warrant. Rather, the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful

or marginal cases in this area should be resolved in favor of upholding the warrant. (*Illinois v. Gates* [1983], 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 followed.)" *Lane*, ¶ 5.

**{¶ 18}** We agree with the trial court's conclusion that Dedrick's affidavit, when considered in its entirety, justifies the conclusion that there was a fair probability that crack cocaine would be found within 1205 Windsor Avenue. Dedrick's affidavit provides in relevant part in Paragraph B:

> On or about November 7, 2011, I received information from a confidential informant that crack cocaine was being sold from 1205 Windsor Avenue by a black male named Dustin. This C.I. has provided information in the past, which has been proven to be true and accurate through independent investigation and had led to the issuance of search warrants

and the recovery of illegal drugs. On or about November 7, 2011, Detective Jason Barnes and I met with the same C.I. for the purpose of attempting a controlled buy of illegal drugs from 1205 Windsor Avenue. Prior to the buy the C.I. was checked for drugs and money and none were found. The informant was then given a sum of money from the Dayton Police Buy Fund and directed to the front door of 1205 Windsor Avenue. Detective Barnes and I took a position of surveillance to the south and observed the C.I. enter an enclosed porch at the front of 1205 Windsor Avenue. Approximately three minutes later we observed the C.I. exit the front porch door and return to our

unmarked vehicle. *The C.I. was again checked for drugs and money and none were found.* The C.I. explained to us that [he] walked to 1205 Windsor Avenue and entered the enclosed front porch. The C.I. continued to a front entrance door and knocked. The door opened and the C.I. was let inside by Suspect # 1. Suspect # 1 is listed and further described in paragraph III, A, 1 of the Search Warrant. Suspect #1 continued to the rear of the residence and returned with a piece of crack cocaine. The C.I. purchased crack cocaine from Suspect #1, exited the residence and returned to our vehicle. (Emphasis added).

Paragraph C of the affidavit provides that Dedrick field tested the substance purchased by the C.I., and that the results were positive for crack cocaine.

**{¶ 19}** Paragraphs D and E describe controlled buys conducted by the confidential informant that occurred on November 11, 2011, and November 28, 2011. Each of those paragraphs contains language identical to that italicized in Paragraph B above. Paragraphs D and E also both conclude with the following sentence: "The C.I. purchased crack cocaine from Suspect #1[,] exited the front door and returned to our unmarked vehicle." The affidavit indicates that field tests of the substances at issue in Paragraphs D and E were field tested and the results were positive for crack cocaine.

**{¶ 20}** We agree with the trial court that the italicized language above (which is the focus of Russell's assigned error), when read in isolation, appears to indicate no drugs were purchased during the course of the controlled buys. However, when the affidavit is read in its entirety, it is clear that the confidential informant purchased crack cocaine on three

occasions at 1205 Windsor Avenue, and that the search warrant was accordingly issued upon probable cause to conclude that crack cocaine would be found at that address. Accordingly, Russell's first assigned error is overruled.

{¶ 21}   Russell's second assigned error is as follows:

"THE TRIAL COURT ERRED BY DENYING MR. BARRON'S [sic] MOTION TO SUPPRESS STATEMENTS."

{¶ 22}   According to Russell, Dedrick did not advise him of his *Miranda* rights.

{¶ 23}   As this Court has previously noted:

"Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted) .   At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted).   The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted).   In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted).   An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence."   *State v. Hurt*, Montgomery App. No. 21009, 2006-Ohio-990.

*State v. Purser*, 2d Dist. Greene No. 2006 CA 14, 2007-Ohio-192, ¶ 11.

**{¶ 24}** We accord great deference to the trial court's factual findings, and we defer to the trial court's assessment of credibility. The trial court expressly indicated that it credited Dedrick's testimony and did not credit the testimony of Russell, and the court adopted Dedrick's testimony regarding Russell's statements as its own factual findings. In other words, Dedrick properly advised Russell of his *Miranda* rights prior to interviewing him, and Russell understood those rights and chose to speak to Dedrick. Russell's second assigned error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

GRADY, P.J. and FROELICH, J., concur.

Copies mailed to:

Carley J. Ingram
Antony A. Abboud
Hon. Michael L. Tucker